**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION**

**TAMMY L. BURNLEY**                                                                        **PLAINTIFF**

**v.**                                          **1:06CV00022-WRW**

**SOCIAL SECURITY ADMINISTRATION**                                      **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this action under sections 205(g) and 1631(c)(3) of the Social Security Act,

42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, for judicial review of a final decision of the

Commissioner of Social Security denying her claim for Disability Insurance (SSD) benefits under

Title II and for Supplemental Security Income (SSI) benefits under Title XVI of the Act,

42 U.S.C. §§ 416(I), 423, 1381-1382c.   The parties have submitted their appeal briefs,[1] and the

issues are now joined and ready for decision.

**I.  Procedural Background**

Plaintiff filed applications for SSD and SSI benefits on March 21, 2002.[2]  Plaintiff alleged

that she became disabled on January 25, 2002, and was unable to work because of two brain

aneurysms, vision problems, headaches, and memory loss.[3]  Her claims were denied initially and

upon reconsideration.[4]  At Plaintiff's request, a hearing was conducted by the Administrative Law

---

[1]Plaintiff's brief was filed on September 22, 2006, and the Commissioner's brief was
filed on October 16, 2006.

[2]Tr.139, 594.

[3]Tr.18, 302.

[4]Tr. 76, 83.

Judge (ALJ) and an unfavorable decision was issued on December 29, 2003.[5]  On July 10, 2004, the

Appeals Council vacated the ALJ's decision and remanded the proceedings for additional evidence

and findings.[6]  A second hearing was conducted by the same ALJ on June 17, 2005, at which

Plaintiff; Arlene Boswell,[7] Dr. Paul Deyoub,[8] and Charles Dwight Turner, the vocational expert

(VE), testified.[9]  On October 28, 2005, the ALJ issued a decision denying Plaintiff's claim for

benefits.[10]  The Appeals Council, on April 8, 2006, denied Plaintiff's request for review, making it

the final decision of the Commissioner.[11]  It is from this decision that Plaintiff seeks judicial review.

## II.  Hearing Testimony

Plaintiff was 43 years old at the time of the second hearing.[12]  She has a high school

education and a degree in cosmetology.[13]  Plaintiff has past relevant work (PRW) experience as an

---

[5]Tr. 56-66.

[6]Tr. 71-73.  The Appeal's Council also noted that Plaintiff had filed subsequent claims for benefits on January 27, 3004, and March 8, 2004, and directed the ALJ to associate the claim files and issue a new decision on the associated claims (Tr. 73).

[7]Plaintiff's mother.

[8]Medical expert.

[9]Tr. 662-729.

[10]Tr. 17-27.

[11]Tr. 7-9.

[12]Tr. 671.

[13]Tr. Id.

office assistant in a chiropractic clinic and as a self-employed hair stylist.[14]  She lives with her 8 year- old son in a rent-free house provided by her mother.[15]

At the hearing, Plaintiff testified that, as a result of brain aneurysms, she has difficulty seeing things and is light sensitive.[16]  She takes Lexapro for depression, Triavil to prevent seizures, and Alprazolam for anxiety.[17]  Plaintiff said she has problems reading.[18]

Dr.  Deyoub, a clinical psychologist, testified that he examined Plaintiff on two different days in December and then in January.[19]  Plaintiff's counsel inquired why Dr. Deyoub had written the ALJ a letter on January 31, 2005 as it appeared that the doctor was responding to someone.  Dr. Deyoub explained that he just realized that he had overlooked an item and had sent the letter to the ALJ to see if he should follow up.[20]  Dr. Deyoub was questioned regarding the testing of Plaintiff including the types of tests performed, the procedures used, the purposes of the CARB to measure one's effort or honesty in performance versus the MMPI measuring personality.[21]  He was also questioned about the various global assessment functioning (GAF) assessments.[22]  Plaintiff's counsel

---

[14]Tr. 18, 710.

[15]Tr. 628, 704.

[16]Tr. 671.

[17]Tr. 671-672.

[18]Tr. 672.

[19]Tr. 673.

[20]Tr. 674-675.

[21]Tr. 675-686.

[22]Tr. 686-690.

also inquired about the mental listing for organic brain disorder.[23]  Dr. Deyoub was asked questions about his testing and findings as compared to the ones of Dr. DeRoeck.[24]

The testimony of Plaintiff then continued.  She testified that she continued to have headaches once or twice a week that would sometimes last a couple of days, and that she used Excedrin migraine headache and hot packs for relief.[25]  Plaintiff stated that her depression was much worse than at the last hearing and she did not think anything had improved.[26]  She said she could has to rest after standing 20-25 minutes and falls asleep when she sits down.[27]

Plaintiff complained of lack of hand/eye coordination and said she could only read large print.[28]  She drives herself less than a mile to church about twice a month.[29]  Plaintiff said she has problems sleeping and takes daily naps.[30]  She mostly heats up things to eat.[31]  Plaintiff testified that she had lost the muscle tone in her body but could carry a gallon of milk for a short distance with both hands.[32]

---

[23]Tr. 690-695.

[24]Tr. 695-701.

[25]Tr. 702-703.

[26]703.

[27]Tr. 705-706.

[28]Tr. 706-707.

[29]Tr. 708.

[30]Tr. 709.

[31]Tr. 711.

[32]Tr. 711-712.

Plaintiff's mother testified that she sees Plaintiff everyday and that Plaintiff has problems getting around, reading bills, and is depressed.[33]

The VE described Plaintiff's PRW as a hair stylist as skilled, light work.  The ALJ posed a hypothetical of a younger individual with a high school education and a degree in cosmetology with physical limitations of occasional lifting/carrying of 50 pounds and frequent lifting/carrying of 25 pounds; stand/walk six hours in an eight hour work day; sit six hours in an eight hour work day; unlimited ability to push/pull, no limitations as to climbing, balancing, stooping, kneeling, crouching and crawling; no visual, environmental, communicative, or manipulative limitations; mental restrictions of a slight limitation in the ability to understand and remember detailed instructions, to carry out detailed instructions, and to make judgments on simple work related decisions; moderate restrictions or limitations in the ability to interact appropriately with the public, supervisors and co-workers; and moderate restrictions or limitations in the ability to respond appropriately to work pressures in a usual work setting and in the ability to respond appropriately to changes in a routine work setting.[34]  The VE responded that such an individual would be able to perform a job as a hair dresser.[35]

A second hypothetical involved an individual with mental restrictions and only a fair ability to follow work rules or to use judgment; a good ability to relate to coworkers, deal with the public, and interact with their supervisors; poor or no ability to deal with work stress, function independently or maintain attention and concentration; a fair ability to understand, remember, and

---

[33]Tr. 719-720.

[34]Tr. 723-724.

[35]Tr. 724.

carry out complex job instructions, and a good ability to understand and remember to carry out simple job instructions; a good ability to maintain personal appearance; a fair ability to relate predictably in social situations; and no or poor ability to behave in an emotionally stable manner and demonstrate reliability.[36]  The VE responded that such a person would not be able to perform the past job as a hairdresser nor any other job in the national economy because there were too may poors and fairs in the hypothetical.[37]

When Plaintiff's attorney posed a hypothetical of an individual with the RFC of sedentary and marked restrictions in the ability to respond to work pressures in a usual work setting or respond appropriately to routine changes even if the other restrictions are slight or moderate, the VE responded that the marked restriction would eliminate work in the national economy.[38]

## III.  Summary of Evidence in Record

Plaintiff was admitted to Baptist Hospital on January 25, 2002, for several days for an aneurysm, and a craniotomy was performed.[39]  A second craniotomy was performed by Dr. Reza Shahim, a neurological surgeon, and she remained under his care from February 7, 2002 to August 15, 2002.[40]  He indicated, in an August 15, 2002 letter to Dr. Lee Vaughan, that Plaintiff had

---

[36]Tr. 724-725.

[37]Tr. 725.

[38]Tr. 726-727.

[39]Tr. 324-333.

[40]Tr. 379-399.

appeared with a lot of complaints about visual changes.  He stated that it was obvious that Plaintiff was very depressed and most of her problems are related to severe depression.[41]

Plaintiff was treated from February 11, 2002 to March 29, 2002 by Dr. Andrew Lawton, an ophthalmologist, who found that Plaintiff suffered from a palsy to the left eye and had vision problem, which was improving.[42]

On May 28, 2003, Plaintiff was seen by Dr. Glenn Lowitz for general psychological testing and to assess cognitive skills as well as indications of depression.[43]  He stated that Plaintiff was very cooperative with testing and it was evident that Plaintiff had difficulty with many of the visual-involved items.[44]  Her verbal IQ was 87, performance IQ was 73, and her full scale IQ was 78.[45]  The WAIS-III profile indicated overall lower average general cognitive functioning.[46]  All performance subtests scores ranged from the borderline level to significantly below average.[47]  The BDI-II showed a clinically severe level of depression.[48]  Dr. Lowitz reported:

> Full neuropsychological testing could be helpful to assess in depth Mrs. Burnley's cognitive changes.  That she again undergo treatment for the depression is certainly

---

[41]Tr. 379.

[42]Tr. 375-378.

[43]Tr. 423.

[44]Tr. 424.

[45]Id.

[46]Id.

[47]Tr. 425.

[48]Id.

warranted.  How much the depression is affecting her cognitive skills and vice versa is difficult to determine at this point.[49]

A consultative examination of Plaintiff was performed by Dr. George DeRoeck, who administered the Wechsler Adult Intelligence Scale, Clinical Background Assessment, Evaluation of Adaptive Function, Neurobehavioral Functioning Inventory, MMPI-2, Incomplete Sentences Blank, Wide Range Achievement Test-3, Rorschach, Luria-Nebraska Neuropsychological Batter, Stroop Neuropsychological Screening Test and Bender Gestalt Visual Motor test.[50]  His report and July 7, 2003 letter related Plaintiff's history daily headaches of varying intensity; her personality changes for the worse with family members; she cried easily; and she had problems with decreased memory and visual processing deficits.[51]

Dr. DeRoeck also found that Plaintiff was cooperative; that her affect was blunted; that her mood was "notably dysphoric;" that she was "attentive, cognitively, able to remain on task and focused;" that she was notably slow in her cognitive processing although she was cogent in her reasoning and overall intellectual ability.[52]  Her arithmetic abilities on testing were affected as was her ability to read numbers on cards.[53]  The doctor found her verbal IQ was 87, her performance IQ was 94, and her full scale IQ was 85.[54]  The Beck Depression Inventory showed that Plaintiff had

_____

[49]Id.

[50]Tr. 428-438.

[51]Tr. 430.

[52]Tr. 431.

[53]Tr. 433.

[54]Tr. 434.

feelings of worthlessness and loss of competence.[55]  The Incomplete Sentences Blank Test revealed

that Plaintiff thought she was retarded.[56]  Significant deficits were evident in visual processing of

colors on the Stroop Test and the results reflected that Plaintiff's overall intellectual processing

ability showed evidence of slowed cognitive processing.[57]  The Wide Range Achievement Test

indicated that Plaintiff read at the third grade level, spelled at the high school level and did

arithmetic at the second grade level.[58]  The results of the MMPI-2 indicated a valid assessment.[59]

Plaintiff exhibited a tendency to be preoccupied with somatic concerns, inefficiency in problem

solving, and a tendency toward dependent/passive style of coping.[60]

Dr. DeRoeck found there was evidence of significantly slowed cognitive processing as well

as clearly evident deficits in symbolic reasoning.[61]  He noted visual processing deficits and that she

fatigued easily.[62]  The doctor further found evidence of "organicity," reflective of the onset of a

learning disability in processing symbolic information.[63]

---

[55]Id.

[56]Tr. 435.

[57]Tr. 435.

[58]Id.

[59]Tr. 436.

[60]Id.

[61]Tr. 437.

[62]Id.

[63]Tr. 438.

His diagnoses were mood disorder due to ruptured aneurysm; ruptured aneurysm, craniotomies, headaches, numbness in her arm and hands; psychological stressors, coping with significant decrease in activities of daily living; and global assessment function (GAF) of 45 with the highest in the past year of 50.[64]  In an August 1, 2003, medical source statement of ability to do work-related activities (mental), Dr. DeRoeck found that impairments to Plaintiff's ability to understand and remember short simple instructions; her ability to carry out short simple instructions and make judgments on simple work-related decisions were slight; and she was moderately impaired in understanding and remembering detailed instructions and carrying out detailed instructions.[65]  She was moderately impaired in interacting appropriately with the public, supervisors, and co-workers and was marked impaired in her ability to respond appropriately to work pressures in an usual work setting and to respond appropriately to changes in routine work settings.[66]

At the request of DDS, Dr. DeRoeck examined Plaintiff again on June 21, 2004.[67]  He found adjustment disorder with mixed emotional features; status post "aneurysm repair" with description of limited tracking ability without sickness to head/stomach, blurry vision, whiplash secondary to motor vehicle accident; psychological stressors, financial difficulty, limited activities of daily living without assistance and increased dependency on family for activities of daily living, victim of

---

[64]Id.

[65]Tr. 439.

[66]Tr. 440.

[67]Tr. 491-497.

physical/verbal abuse from her first marriage; and GAF of 48 with the highest of the past year at 53.[68]  No indication of embellishment or malingering was noted.[69]

Dr. Neville Weston, an ophthalmologist, examined Plaintiff on July 26, 2004 and found her to have mild myopia with presbyopia.  He strongly suggested that she obtain a psychiatric evaluation.[70]

Dr. Deyoub examined Plaintiff on December 16, 2004 and again on January 10, 2005, administering the Mental Status Examination, Wechsler Adult Intelligence Scale, Wide Range Achievement, Wonderlic Personnel Test, Wechsler Memory Scale, Bender Gestalt Drawing, Computerized Assessment of Response Bias, Stroop Neuropsychological Screening Test, Halstead-Reitan Neuropsychological Test Battery for Adults, Minnesota Multiphasic Personality Inventory, Millon Clinical Multiaxial Inventory, Beck Depression Inventory, Beck's Anxiety Inventory, Incomplete Sentence and Personal Problems Checklist of Adults.[71]  He found some disturbance in her immediate memory and concentration and that the Bender Gestalt Drawings were poorly done.[72] The doctor determined that, using the CARB, there was symptom amplification although not necessarily malingering; "she overstates and exaggerates symptoms while she may well experience all the symptoms and distress."[73]  In a medical source statement, he found that the Plaintiff had no

---

[68]Tr.496-497.

[69]Tr. 497.

[70]Tr. 498.

[71]Tr. 559.

[72]Tr. 563.

[73]Tr. 568.

limitation in understanding and remembering short simple instructions or carrying out short simple

tasks; that she was sightly limited in her ability to understand, remember, and carry out detailed

instructions; her ability to make adjustments on simple work related activities were likewise slight;

that she had a moderate limitation interacting with the public and supervisors, interact appropriately

with co-workers, respond appropriately to work pressures and routine work changes.[74]  In his

January 31, 2005 letter to the ALJ, Dr. Deyoub stated that he inadvertently omitted administering

the Rorschach and was reluctant to ask Plaintiff to come back a third time because it had been very

stressful her to complete testing in two different sessions.  He opined that he did not expect the

Rorschach to show any mental disorganization since there was clearly no thought disorganization

or history of psychosis.[75]

## IV. The Commissioner's Final Decision

Plaintiff had the burden of proving her disability by establishing a physical or mental

impairment lasting at least one year that prevents her from engaging in any substantial gainful

activity.[76]  The ALJ undertook the familiar five-step analysis in determining whether Plaintiff was

disabled.[77]  The ALJ found that Plaintiff has not engaged in substantial gainful activity since the

---

[74]Tr. 573.

[75]Tr. 557.

[76]42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); Baker v. Apfel, 159 F.3d 1140, 1143 (8th Cir. 1998); Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

[77]The five-step sequential evaluation is as follows:  (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether he or she has a severe and medically determinable physical or mental impairment; (3) whether the claimant may be deemed disabled because  the impairment meets or equals a listed impairment in Appendix 1 to Subpart P, Title 20, Code of Federal Regulations; (4) whether the claimant is able to return to past relevant work, despite the impairment; and if not (5) whether the claimant can perform any other kind of work. 20 C.F.R. §§  416.920 and 404.1520.  See Cox v. Barnhart, 345 F.3d 606 , 608 n.1 (8th Cir.

alleged onset of disability.[78]  He found that Plaintiff had severe impairments of a history of ruptured

cerebral aneurysm x 2 with craniotomies, depression NOS, and an anxiety disorder, but that none

of them were severe enough to meet or be medically equivalent to an impairment listed in Appendix

1, Subpart P, Regulations No. 4 and No. 16.[79]  He further found that Plaintiff had not satisfied the

requirements of Listing 12.02A and B as confirmed by Dr. Deyoub who testified at the hearing.[80]

The ALJ noted that while some of the other examining physicians had found marked limitations in

various areas, he did not give them controlling weight as not being supported by the preponderance

of the evidence.[81]

        The ALJ evaluated Plaintiff's subjective allegations and complaints pursuant to the criteria

set forth in Polaski v. Heckler, 739  F.2d 1320 (8th Cir. 1984).[82]  He found Plaintiff's subjective

allegations not to be fully credible.[83]  The ALJ stated that Dr. Deyoub found no marked limitations

in any areas of function and that the doctor believes that a person does not have a severe impairment

if it is only a slight or even moderate limitation, but that a marked limitation is a severe

---

2003).

        [78]Tr. 18.

        [79]Id.

        [80]Tr. 18-19.

        [81]Tr. 19.

        [82]These include the claimant's prior work record, and observations by third parties and
treating and examining physicians relating to such matters as (1) the claimant's daily activities;
(2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors;
(4) dosage, effectiveness and side effects of medication; and (5) functional restrictions.  Polaski
v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

        [83]Tr. 19.

impairment.[84]  Dr. Deyoub did not believe Plaintiff's impairments and limitations met or equaled any listing and specifically Listing 12.02.  Since he was a clinical psychological examiner who rendered an opinion, which was also based on the most recent examination, supported by the record as a whole, the ALJ gave Dr. Deyoub's opinion controlling weight in evaluating Plaintiff's RFC.[85] The ALJ thoroughly reviewed the examinations of Dr. Deyoub, Dr. Lowitz, and Dr. DeRoeck pointing to the consistencies and inconsistencies with other evidence.[86]  The ALJ specifically observed that in spite of Plaintiff's allegations regarding her vision impairment, her daily activities included driving which was inconsistent with her claim as well as the examinations of the neuro-ophthalmologist and the ophthalmologist who found no objective evidence of visual blurring or other problems beside myopia.[87]

He further noted Dr. DeRoeck's report that Plaintiff was in counseling, which was helping, and she was not on medication at the time.[88]  The ALJ stated that Plaintiff's work record neither detracted nor enhanced her credibility, but he noted that she, as a self-employed person, would have more control over her hours.[89]  He did not give significant weight to the testimony of Plaintiff's mother.[90]  The ALJ also noted that the state agency held that Plaintiff could perform medium work.

---

[84]Tr. 20-21.

[85]Id.

[86]Tr. 20-23.

[87]Tr. 23-24.

[88]Tr. 24.

[89]Id.

[90]Tr. 25.

The ALJ found this consistent with Dr. Deyoub's findings and his assessment of Plaintiff's RFC -- that she could perform medium work and had only moderate limitations in her ability to interact appropriately with co-workers, supervisors, and the public and in her ability to respond appropriately to changes and work pressures in a usual setting.[91]

The ALJ stated that the VE had been asked a hypothetical based on an individual of Plaintiff's age, education, PRW and with the same limitations as the ALJ had found, and that the VE testified that such limitations do not preclude the performance of Plaintiff's PRW as a hair stylist.[92] Therefore, the ALJ found that Plaintiff is not disabled.[93]

## V. Standard of Review

The Court's function on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.[94]

## VI. Plaintiff's Arguments

---

[91] Id.

[92] Id.

[93] Id.

[94] Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

-15-

Plaintiff contends that the ALJ's decision is against the greater weight of the medical evidence from her treating neurologist Dr. Shahim; Dr. Lowitz; and Dr. DeRoeck. Plaintiff further asserts that the ALJ did not provide her with a full and fair hearing as it appears that the ALJ had an ex parte communication with Dr. Deyoub. She argues that the ALJ did not fully explain why he placed Dr. Deyoub's opinion over the other professionals – including treating physicians – and Dr. Deyoub's finding are discredited by his use of technicians to administer at least some of the tests. In addition, Plaintiff questions the ALJ's assessment of the demands of Plaintiff's past work since the Dictionary of Occupational Titles states that a cosmetologist occupation is performed at the light level of exertion, but requires speaking well enough for an audience; that the person has poised voice control and confidence using correct English in a well modulated voice; and is required to perform a variety of duties, deal with the public, and make judgments and decisions. She continues that the ALJ did not give thorough consideration to all of the evidence of record as he placed undue reliance of Plaintiff's demeanor at the hearings as well as his experiment to determine her visual restrictions. Plaintiff also contends that her impairments preclude her returning to her PRW since she is not able to work in a stressful and competitive environment on a regular and continuing basis. Finally, Plaintiff asserts that the ALJ did not ask the VE a properly framed question as the one asked was based on flawed evidence which was not substantial whereas Plaintiff's counsel asked a hypothetical that considered her true limitations and to which the VE responded that there were no jobs that Plaintiff could perform.

**VII. Discussion**

The Court rejects Plaintiff's challenge to the ALJ's fairness and objectivity and her argument that he did not provide her with a full and fair hearing.  The Commissioner is correct in pointing out that the ALJ's admission of Dr. Deyoub's report was without objection although Plaintiff' counsel did question the weight to be afforded it.  The Court also finds no merit to Plaintiff's argument that there was improper communications between the ALJ and Dr. Deyoub.  Dr. Deyoub's letter is part of the record; moreover, the letter clearly explains that it was written due to the doctor's discovery that he had inadvertently omitted a requested test.  Regarding Plaintiff's allegation that the ALJ tested her ability to see the seal at the hearing, "[t]he ALJ's personal observations of the claimant's demeanor during the hearing [are] completely proper in making credibility determinations."[95]

The Court finds the ALJ made a proper credibility analysis.[96]  An ALJ may discredit subjective complaints of pain if they are inconsistent with the record as a whole.[97]  "It is for the ALJ as trier of fact to give the testimony of family members and friends such credence as he deems warranted."[98]  The ALJ did a thorough review of the medical findings and detailed why he found Dr. Deyoub's assessment consistent with the preponderance of the other evidence despite Plaintiff's extensive examination of Dr. Deyoub's testing methods and results at the hearing.  He also reviewed the lack of medical evidence supporting the alleged impairments to Plaintiff's vision and her physical limitations in his eleven page opinion.  In essence, Plaintiff disagrees with the ALJ's

---

[95]Johnson v. Apfel, 240 F.3d 1145, 1147-48 (8th Cir.2001).  See also, Kirby v. Astrue, ____F.3d _____, 2007 WL 2593631, at *3 (8th Cir. 2007)

[96]See, Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

[97]Barry v. Shalala, 885 F. Supp. 1224, 1225 (N.D. Iowa 1995).

[98]Kisling v. Chater, 105 F.3d 1255, 1258 (8th Cir. 1991).

credibility findings, but the Court cannot substitute its own when there is evidence to support such findings.

Finally, a properly phrased hypothetical question, as posed by the ALJ here, constitutes substantial evidence.[99]

## VIII.  Conclusion

Accordingly, after careful consideration of the record as a whole, the ALJ's decision was supported by substantial evidence and is AFFIRMED.

IT IS SO ORDERED this 28th day of September, 2007.


/s/Wm. R. Wilson, Jr.
UNITED STATES DISTRICT JUDGE

---

[99]Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).